**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

JOHN DOE,

                Plaintiff,

   -  against –

JENNIFER LYNN GROSS, *a.k.a.*
JENNIFER STENGAARD GROSS

                Defendant.

---------------------------------------------------------------X

Civil Act. No. 1:23-cv-06325

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

<u>**FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY**</u>

Plaintiff, JOHN DOE, (hereinafter referred to as "Plaintiff" or "Mr. Doe"), by and through Plaintiff's attorneys, DEREK SMITH LAW GROUP, PLLC, as and for Plaintiff's First Amended Complaint in this action against the Defendant JENNIFER LYNN GROSS, *also known as*, JENNIFER STENGAARD GROSS, (hereinafter referred to as "Defendant Gross" and/or "Ms. Gross"), upon both information and belief, alleges as follows:

<u>**JURISDICTION AND VENUE**</u>

1.    At its core, this case is about a homosexual man, who was lured under false pretenses, and through means of threats, blackmail and drugs was subsequently sexually assaulted against his will by a woman who presented as a "friend" and business contact. Defendant in turn utilized her unique position of power, influence and threats of reputation and physical violence, to sexually assault Plaintiff and steal his sperm.

2.    Plaintiff John Doe brings this is an action for monetary damages and all other appropriate relief as deemed appropriate by the court, for sexual assault and battery, intentional infliction of emotional distress, pursuant to state New York and California tort law, and hereby seeks monetary relief to redress Defendant Gross's unlawful and morally corrupt conduct.

Additionally, this action seeks to redress the deprivation of Mr. Doe's personal dignity and autonomy over his own body and that of his future progeny.

## JURISDICTION AND VENUE

3.     This is an action for monetary damages and all other appropriate relief as deemed by the court, pursuant to the varying tort claims herein under New York and California State Law.

4.     Jurisdiction of this action is also conferred upon the Court as this action involves Diversity of Citizenship under 28 U.S.C. §1332.

5.     For the purposes of this filing, Plaintiff Doe is not a citizen of the State California.[1]

6.     For the purposes of this filing, Defendant Gross is a citizen of the State of California.

7.     The matter in controversy exceeds $75,000.

8.     In accordance with the Federal Rules of Civil Procedure, venue is proper in this district based upon the fact that a substantial part of Defendant Gross' unlawful and immoral actions in violation of Plaintiff's body occurred within the Southern District of New York. Furthermore, Defendant Gross was and still is believed to be located in this judicial district, including ownership of a secondary residence within New York City. In sum, a substantial part of the events or omissions giving rise to this action, including the unlawful assault and battery alleged herein occurred in this district.

## PARTIES

9.     Plaintiff, John Doe (hereinafter also referred to as Plaintiff and "Mr. Doe") is an individual homosexual male.

---

[1] Due to concerns regarding his safety, and in an effort to ensure his anonymity, Plaintiff Doe has refrained from indicating the precise state in which he resides.

10.    Plaintiff is a sexual assault victim and is identified herein as JOHN DOE. Please see *Doe v. Blue Cross & Blue Shield United of Wisc.,* 112 F.3d 869, 872 (7th Cir. 1997) ("fictitious names are allowed when necessary to protect the privacy of ... rape victims, and other particularly vulnerable parties or witnesses"). Additionally, "the public generally has a strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes." *Doe No. 2 v. Kolko,* 242 F.R.D. 193, 195 (E.D.N.Y. 2006); *see also Doe v. Evans,* 202 F.R.D. 173, 176 (E.D. Pa. 2001) (granting anonymity to sexual assault victim); *Doe v Penzato*, No. 10 Civ. 5154 (MEJ), 2011 WL 1833007, at *3 (N.D. Cal. May 13, 2011).

11.    At all times material, Plaintiff Doe is a model, actor and writer who works in television and film.

12.    At all times material, Defendant Jennifer Lynn Gross (hereinafter referred to as "Defendant" and/or "Ms. Gross") is a citizen of the State of California, and currently residing in Los Angeles County.

13.    At all times material, Defendant Smith has been also known as "Jennifer Stengaard Gross."

14.    At all times material, Plaintiff is a former spouse and husband of Defendant GROSS, although said nuptials were devised through Defendant Gross' fraudulent and extrusion, and not entirely of Mr. Doe's free-will.

## FACTUAL BACKGROUND COMMON TO ALL CAUSES OF ACTION

15.    In or around early 2011, Plaintiff and Defendant first met each other and struck up a brief conversation.

16.    Following the party, Defendant Gross discovered Plaintiff was an up-and coming television actor and successful luxury model. Defendant Gross thereafter began her course of forcibly invading Plaintiff's personal life without his consent. As an initial matter, Defendant Gross obtained Plaintiff's phone number without his permission from an acquaintance and began to pursue Plaintiff.

17.    During the course of their initial conversations, Defendant Gross falsely maintained that she was a "very successful multi-billionaire" with credits as a Movie and Music producer, leading Plaintiff to believe that she was interested in furthering his career.

18.    As a point of context, Plaintiff is a homosexual male and, at all times made it clear to Defendant Gross that Plaintiff was "not available." Utterly undeterred, Defendant Gross continued to pursue Plaintiff.

19.    Defendant Gross knowingly and purposefully took full advantage of Plaintiff. During their early conversations, Plaintiff confided in Defendant Gross his financial struggles, and, more specifically, that he was at his lowest point in his professional career and had extensive medical bills relating to a recent injury he suffered having been run over by a drunk driver. She was aware that Plaintiff endured major brain injuries, was in a coma, initially unable to walk or speak, went through extensive physical therapy and had undergone numerous surgeries. Despite this knowledge, if not utilizing it to her benefit, Defendant took full advantage of her wealth and Hollywood connections to continually sexually and mentally abuse Plaintiff.

20.    Unbeknownst to Plaintiff at the time, Defendant Gross has a sorted history of targeting young models, actors and artists, using her power as a wealthy woman to groom them for her own selfish sexual desires. In what presents itself as the cliché deviant "casting couch" behavior, the Defendant would tell her young victims that she is a movie producer and/or a music

producer with lots of Hollywood connections and seemingly endless finances/resources. She thereafter promises that only she can make them into "A-List" stars. She does this in order to seduce and sexually abuse these vulnerable young artists. Her reputation is such that she has been referred to as the "female Harvey Weinstein" in certain circles of young-Hollywood.

21.     In or around 2011, Defendant Gross set her sights on Plaintiff and used this method on Plaintiff to try to seduce him with guarantees to fully finance his television and film projects, while suggesting that she would thereafter receive a producer's credit.

22.     As stated above, from the outset of their communication Plaintiff repeatedly informed Defendant that he was not interested in anything other than a professional and platonic business relationship.

23.     Over the proceeding weeks, Defendant insisted upon meeting with Plaintiff multiple times, during which they discussed developing Plaintiff's own scripts and interviews he had personally prepared, and auditions. In time, throughout these meetings, Plaintiff and Defendant became platonic friends, all the while Defendant Gross inflated Plaintiff's value and skills, assuring him he would be a future star with her support and financing.

24.     Shortly thereafter, Defendant Gross requested that Plaintiff give her manuscripts he had written so that Defendant could read them with the expressed intent to finance Plaintiff's projects. In reality, Defendant Gross had no legitimate intention of providing any support to Plaintiff's career.

25.     In or around May 2011, Defendant Gross insisted Plaintiff join her on a work trip to Cabo San Lucas, Mexico. In no uncertain terms, Defendant threatened Plaintiff, stating that if he didn't come with her, she would neither finance Plaintiff's projects nor work with Plaintiff any

further. Defendant Gross made it clear that if Plaintiff was serious about partnering with Defendant Gross in any business dealings, then Plaintiff would have to join.

26.    Plaintiff advised that he could not afford the trip, hoping this would not create any tension and provide him with an easy route to avoid traveling with Defendant. Undeterred by financial constraints, Defendant Gross insisted she would pay for the trip and demanded that Plaintiff come.

27.    Plaintiff agreed to join but made it clear to Defendant Gross that he was romantically not interested. Plaintiff further informed Defendant Gross that he was in a committed relationship and was "not available." Defendant Gross assured Plaintiff the trip would be business oriented, insisting he had nothing to worry about.

28.    Immediately after arriving in Cabo San Lucas, Mexico, Defendant Gross wasted no time, beginning almost immediately to sexually harass and assault Plaintiff.

29.    As an initial matter, Defendant Gross, in arranging the trip and without consulting Plaintiff, intentionally booked a room with one (1) bed and instructed the Plaintiff that he had to share it with her.    Plaintiff refused to sleep in the bed with Defendant.

30.    On another occasion during the trip, while in the swimming pool, Defendant Gross jumped on Plaintiff, proceeded to grab Plaintiff's penis under the water and tried to kiss Plaintiff. Defendant plied Plaintiff with alcohol, insisting Plaintiff drink tequila with her, and regularly intentionally over-serving Plaintiff alcohol, with the express purpose of lowering Plaintiff's inhibitions so that she could continue sexually assaulting Plaintiff.

31.    After the experience in the pool, Plaintiff decided to confide in Defendant Gross that he was a closeted, homosexual male. Fearful of this hurting his future career, Plaintiff thought it best to be upfront and honest with Defendant Gross so there would be no future sexual

harassment or assaults and no misunderstandings. Defendant Gross expressed shock, and disappointment, but agreed to continue a friendship and business relationship.

32.    Plaintiff stayed on in Mexico and did begin to think Defendant Gross was a friend and professional confidante. Throughout the trip, Defendant Gross began to tell Plaintiff "Cautionary tales" about her "billionaire father" being dangerous and violent to enemies of hers and of the family, destroying their careers and even lives. She mentioned her father is "tracking & monitoring" them since she's "a multi-billionaire" and claimed that the Plaintiff is now being monitored and tracked by her family 24/7.    She used these threats to instill fear into Plaintiff, and in turn to get obedience out of fear.

33.    At some point during the trip, Defendant Gross became mindful that the trip was coming to an end soon. She told the Plaintiff that he would have to keep traveling with her around the world to work on Plaintiff's scripts and production company and said it would be strictly professional and platonic. John Doe expressed in no uncertain terms that he did not have money to cover his rent and had to return home immediately to return to work so that he would not be evicted. Defendant continued to use her power of wealth and fear to manipulate Plaintiff, along with promises to work on Plaintiff's scripts that Defendant Gross promised to finance and co-develop.

34.    In what would become a clear pattern of disregarding Mr. Doe's emotional, physical and financial wellbeing, Defendant Gross flaunted her wealth, falsely assuring Plaintiff that she had "endless money" and that "money doesn't matter" and that, because it came from the endless coffers of her father, she "loves to give it to help friends." In addition to his finances, she utilized Mr. Doe's faith to coerce and manipulate him. On one such occasion, Defendant told Mr. Doe

that her Spiritual Advisor had "prophesized" that he was "supposed to get run over by the drunk driver so that she could be his Guardian Angel, giving her life purpose and meaning.

35.    Defendant Gross knew Plaintiff was brought up in a religious home and would routinely threaten to "out" him, putting his relationships with his family and faith directly at risk and under her control as a result.

36.    Believing Defendant Gross at her word when she assured Plaintiff their relationship would remain business oriented, Plaintiff and Defendant Gross flew to Paris, France and spent time there working. Again, Defendant insisted on sharing one bed anywhere they stayed.

37.    At some point during the stay in Paris, Defendant Gross told Plaintiff that her father would not accept her having a business partner who was gay because he was very religious.

38.    Defendant Gross suggested that, since her father would never let her partner with a gay man, that she and Plaintiff should get married in California with no prenuptial so they would be officially 50/50 equal partners in any and all personal finances and business matters so Plaintiff could stay in the closet being gay, and so they could partner in business with the blessing of her father. Defendant Gross explained to Plaintiff that marrying Defendant Gross would help Plaintiff "stay in the closet" and Defendant Gross could protect his career. While unorthodox, Plaintiff was keenly aware that similar relationship existed all throughout Hollywood between "trusted" friends, and believed this too was a trusted ally.

39.    Immediately upon their return from Paris, Defendant forced Plaintiff to marry her in a haphazard and rushed secret wedding ceremony, refusing to permit anyone else but themselves to be present, and barring Plaintiff from sharing the news with anyone else.

40.    Furthermore, Defendant Gross insisted that Plaintiff cut off all communication with his family, before their "Wedding," warning that her father's private investigators/bodyguards may be listening/reviewing their calls, emails, text messages, etc.

41.    On or around June 8, 2011, Plaintiff and Defendant Gross were married. Plaintiff considered Defendant Gross to be a close friend and business partner. But the same could not be said for Defendant Gross.

42.    Despite their understanding that there would be no sexual relations in the marriage, on the eve of the wedding night, Defendant Gross drugged and raped Plaintiff. This took place in Los Angeles, California. Defendant purposefully took absolute autonomy over Plaintiff's body, denying him of any freewill. When Plaintiff Doe resisted physically, Defendant Gross took coercive steps, pressuring Plaintiff through threats, primarily focused on his sexual orientation and publicly "outing" him or suggested he may be at risk of physically harm if her father became aware of their "relationship."    But what became a horrifying trap only escalated into the more bizarre and traumatizing.

43.    Shortly thereafter, Plaintiff demanded an annulment. Plaintiff wanted nothing further from Defendant Gross, hopeful that they could simply go their own way amicably.

44.    Unsurprisingly, Defendant Gross denied Plaintiff's demand for an annulment and promised Plaintiff that they would remain platonic business partners moving forward. She further promised to fully fund Plaintiff's career projects on the sole condition that he remain silent. But this decision was devoid of free will. Defendant Gross while groveling again made her threats clear: she would "ruin" Plaintiff if he left her.

45.    Furthermore, Defendant Gross thereafter disclosed that she wanted Plaintiff's child from the moment they met. Defendant Gross insisted she was "getting older" and "running out of

time." At the same time, Plaintiff feared due to Defendants threats that if he did not do what Defendant told him to do then she and her family would destroy his career and family. When he protested, Defendant Gross further demoralized Plaintiff, insisting that "No one would ever believe a gay whore over me." Her threats were clear: "If you ever tell anyone, your career will be over. I know everyone in Hollywood; my father is the "Bond-King" and controls all of Hollywood."

46.    Given the extreme disparity in their power dynamic, and despite believing that he was a strong man, Plaintiff was stuck: Who would believe *him* if he spoke up? Plaintiff stayed in the marriage in the hopes that Defendant would stop abusing him. Plaintiff feared that Defendant Gross would physically hurt him and/or his family or his career. But even he could not have predicted how she would react going forward.

47.    Even having harbored sufficient ability to manipulate and control Plaintiff, preventing him leaving her, Defendant Gross still chose to hurt Plaintiff's career, and continued to ply Plaintiff with drugs and alcohol, as she also would do to other poor vulnerable artists and models.   Defendant Gross wanted to ensure that Plaintiff was so emotionally and financially destroyed, that he maintained virtually no independent source of income, and was solely reliant on her.

48.    By means of example, Defendant Gross instructed Plaintiff that he was "not allowed" to get a job in the food service industry as it would be "embarrassing to [her and her family] to be married to a waiter."

49.    Furthermore, aware of Defendant's motivation to secure a child from Plaintiff, with or without his consent, Plaintiff made every step to ensure they did not engage in intercourse, despite repeated threats of physical and emotional terrorism. When her efforts to conceive were

met with this futility, she devised a new tactic: Defendant Gross would require that Plaintiff masturbate and collect his semen utilizing a turkey baster, thereafter Defendant Gross would use this archaic measure to manually inseminate herself. It was both inhumane and demoralizing. To be clear, this was not something required in private but rather, a full view of Defendant Gross. When Plaintiff would attempt to find seclusion in a bathroom, Defendant Gross would force the door open and, on some occasions, even begin to "assist" Mr. Doe against his will.

50.    Defendant Gross required daily collection of semen from Mr. Doe.

51.    In a particularly isolating and chaotic tactic, Defendant forced Plaintiff to arrange a meeting with his family. The purpose of the meeting, as required by Defendant, was to (1) "convince" his family that he was not "actually" gay, (2) advise his family that Defendant and he were in love, and (3) that he was married to Defendant. In sharing this information with his observant Christian family who had only just begun to process his sexual identity, Plaintiff was met with vitriol and disgust. His family called Plaintiff a "whore" and insisted they wanted nothing to do with Plaintiff and his "fake marriage." Plaintiff's mental health spiraled as he struggled in isolation.

52.    As a result of the terror, Plaintiff began having daily panic attacks. He was working to develop a new production company, hopeful it would provide him with the means to break away from Defendant Gross, but the anxiety persisted. His mind would race, flooded with suicidal thoughts and ideations. His life was no longer his own.

53.    Defendant Gross was aware of the emotional terror and panic attacks but, rather than providing support, she only escalated her treatment: sexual assault, threats, drinks, and drugs, all on repeat.

54.     The harsh reality was that Defendant Gross would sexually assault Plaintiff and keep him in the relationship under the fear that she would reveal his homosexuality, that her and/or her family would physically harm him and ruin his career by pull out of developing the production company and all the Plaintiff's projects and future work. At the same time, she would gaslight Plaintiff, keeping him in the relationship with promises of career advancement.

55.     On one occasion, around June of 2011, while Plaintiff and Defendant were staying at the W Hotel Union Square in New York City, Defendant Gross refused to let Plaintiff sleep in his own bed and swore she would not sexually molest Plaintiff anymore.   Plaintiff woke up the next morning to Defendant Gross raping Plaintiff. Angrily, Plaintiff pushed Defendant off him and went to the bathroom feeling sick.

56.     Defendant Gross continued to force Plaintiff to give to her his sperm in a turkey baster, while sexually assaulting him for her pleasure and so she could become pregnant. Plaintiff, being forced to give Defendant Gross his sperm, would try to have privacy in the bathroom, but Defendant Gross would open the door and masturbate while demanding that Plaintiff produce sperm. Oftentimes, she would sexually assault Plaintiff while he was trying to produce sperm for her.

57.     On a frequent basis, while in bed, Defendant Gross would grab Plaintiff's penis and masturbate against his will.

58.     On other occasions, Plaintiff would wake up to Defendant Gross sucking his penis against his will. This happened both in Los Angeles and in New York City.

59.     At all times material, Plaintiff begged Defendant Gross to stop. Defendant Gross refused, claiming Plaintiff was her husband and was legally required to do what Defendant Gross says. Defendant acted without fear of accountability or retribution.

60.    Her conduct, deplorable in nature, evidenced by her archaic and outdated mindset that one cannot rape their spouse. To Defendant Gross, Plaintiff was nothing more than a sperm bank to be utilized at her discretion. She no longer seemed to pay mind to the human in front of her that she was slowly destroying.

61.    In further escalation and efforts to break Plaintiff of his resistance, Defendant Gross instructed Plaintiff that he was to "recruit [his] hot model friends" to fulfill her "unfulfilled" sexually desires.

62.    At or around this time, Defendant Gross claimed to have conceived Plaintiff's unborn child. All the while, Defendant Gross continued to consume alcohol and narcotics, despite Plaintiff pleading for the safety of his unborn child. Defendant Gross would retort, "I will do whatever I want," insisting that Plaintiff was a "child", and she has "all the power."

63.    Plaintiff even so much as contacted Defendant's family, begging that they intervene but received no support.

64.    As quickly as the surprise announcement of their pending pregnancy was sprung on him, Defendant Gross informed Plaintiff that she had "lost" the baby. To this day, Plaintiff is still uncertain as to whether Defendant Gross ever actually conceived a child or if it was merely a tactic to further manipulate and control him.

65.    Following their "loss", Defendant Gross began manipulating Plaintiff and demanding that Plaintiff give Defendant Gross his sperm in a turkey baster on a regular daily basis so she could impregnate herself.

66.    Plaintiff was at the end of his rope: his panic attacks controlled his life, as he spiraled into a deep depression. He was certain he had nothing to live for, and was now both suicidal and addicted to the drugs and alcohol pressed upon him by Defendant Gross.

67.    Feeling as though he had nothing left to lose at this point, he demanded an annulment. Plaintiff Doe merely wanted the marriage to end and to part ways with Defendant Gross as though the endless terror had never occurred.

68.    In or around May of 2012, Plaintiff and Defendant Gross were divorced.[2] Defendant Gross kicked Plaintiff out of his then home, cancelled his credit cards and bank accounts, leaving him homeless and without any financial resources.

69.    Following the divorce, Defendant Gross became aware that Plaintiff was in Los Angeles for work. Upon discovering this, Defendant Gross demanded Plaintiff meet him at her home. Unaware of what action she would take if he refused, and feeling empowered by his recent independence, Plaintiff reluctantly agreed.

70.    When he entered the home, leaving space for platonic interaction, Defendant Gross became instantly irritated, demanding to know why Plaintiff did not give his "wife" a hug. Plaintiff reluctantly agreed and, as quickly as he leaned forward for a hug, Defendant Gross shoved her hand against Plaintiff's shorts and grabbed his penis while simultaneously forcing her tongue in his mouth. Plaintiff Doe pushed her away and fled from her home.

71.    The above are just some examples of some of the unlawful conduct and comments to which Defendant Gross subjected Plaintiff Doe.

72.    As a result of Defendant Gross' outrageous and unspeakable conduct, Plaintiff Doe was caused to sustain serious and permanent personal injuries, including permanent psychological injuries, in addition to severe emotional distress.

73.    As a result of Defendant Gross' actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, and embarrassed. Plaintiff is a strong and independent person but,

---

[2] Plaintiff Doe adamantly refuted the manner in which the divorced was obtained but is not litigating the divorce proceedings in this lawsuit.

as a result of the events above, wholly second guesses every decision he makes. He worries that every moment he exposes himself to added risk, hindering his own ability to move forward personally and professionally.

74.    Plaintiff Doe suffers from regular panic attacks and nightmares relating to Defendant Gross' conduct. He worries each day, wondering when Defendant and/or her family will get their retribution towards him. Plaintiff suffered from regular thoughts of suicide as his only means of escape from Plaintiff.

75.    Furthermore, because of being plied with endless alcohol at Defendant's behest, Plaintiff began copping with alcohol, developing an unhealthy dependency.

76.    In recalling the events and processing the lack of control imposed upon him, Plaintiff agonized over the potential risk of sexually transmitted diseases for months on end.

77.    As a result of the tremendous fear and apprehension associated with the conduct of Defendant Gross, Plaintiff uprooted his entire life and moved to a location unknown to the Defendant, an exorbitant expense he would not have incurred but for her outrageous actions.

78.    As a result of the acts and conduct complained of herein, Plaintiff Doe has suffered future pecuniary and reputational losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

79.    As Defendant Gross' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against Defendant Gross.

## <u>COUNT ONE</u>
**A Cause of Action under State Law § 213-C By Victim of Conduct Constituting
Certain Sexual Offenses Aggravated Sexual Abuse in the First Degree**

80.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

81.    Section § 130.35 of the New York State Penal Law provides as follows:

**Rape in the first degree 1.  A person is guilty of rape in the first degree when he or she engages in sexual intercourse with [fig 2] another person: 1. By forcible compulsion; or 2. Who is incapable of consent by reason of being physically helpless; or 3. Who is less than eleven years old; or 4. Who is less than thirteen years old, and the actor is eighteen years old or more. NY CLS Penal § 130.35 § 130.50 of the New York State Penal Law provides as follows:  Criminal sexual act in the first degree A person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct or anal sexual conduct with another person:  By forcible compulsion; or 2. Who is incapable of consent by reason of being physically helpless; or 3. Who is less than eleven years old; or 4. Who is less than thirteen years old, and the actor is eighteen years old or more.**

82.    Section § 130.70 of the New York State Penal Law provides as follows:

**NY CLS Penal § 130.50.  Section 130.70 of the New York State Penal Law; "Aggravated sexual abuse in the first degree" provides that "A person is guilty of aggravated sexual abuse in the first degree when he inserts a foreign object in the vagina, urethra, penis or rectum of another person causing physical injury to such person:  (1) By forcible compulsion; or  (2) Who is incapable of consent by reason of being physically helpless. Aggravated sexual abuse in the first degree is a class B felony."**

83.    Defendant violated the herein sections as set forth herein.

84.    Section § 213-c of the Civil Practice Law and Rules provides as follows:

**§ 213-c. Action by victim of conduct constituting certain sexual offenses:**

**Notwithstanding any other limitation set forth in this article, except as provided in subdivision (b) of section two hundred eight of this article, all civil claims or causes of action brought by any person for physical, psychological or other injury or condition suffered by such person as a result of conduct which would constitute rape in the first degree as defined in section 130.35 of the penal law, or rape in the second degree as defined in subdivision two of section 130.30 of the penal law, or rape in the third degree as defined in subdivision one or three of**

**section 130.25 of the penal law, or criminal sexual act in the first degree as defined in section 130.50 of the penal law, or criminal sexual act in the second degree as defined in subdivision two of section 130.45 of the penal law, or criminal sexual act in the third degree as defined in subdivision one or three of section 130.40 of the penal law, or incest in the first degree as defined in section 255.27 of the penal law, or incest in the second degree as defined in section 255.26 of the penal law (where the crime committed is rape in the second degree as defined in subdivision two of section 130.30 of the penal law or criminal sexual act in the second degree as defined in subdivision two of section 130.45), or aggravated sexual abuse in the first degree as defined in section 130.70 of the penal law, or course of sexual conduct against a child in the first degree as defined in section 130.75 of the penal law may be brought against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of the said conduct, within twenty years. Nothing in this section shall be construed to require that a criminal charge be brought or a criminal conviction be obtained as a condition of bringing a civil cause of action or receiving a civil judgment pursuant to this section or be construed to require that any of the rules governing a criminal proceeding be applicable to any such civil action.**

85.    Defendant is civilly liable under § 213-c for violating all the above Sections of the New York State Penal Law as described above.

86.    Defendant Gross engaged in illegal and improper touching of Plaintiff Doe, against his will and without his consent.

87.    As a result of Defendant Gross' conduct, Plaintiff was placed in apprehension and fear for his physical well-being.

88.    Because of Defendant Gross' position of financial, physical and emotional authority over Plaintiff, and his known mental and emotional state at the time, Plaintiff was unable to, and did not, give legal consent to such acts.

89.    In performing the conduct describe at length above, the Defendant Gross committed a sexual battery and assault against Plaintiff because she intentionally engaged in unlawful,

intentional, and offensive touching or application of force to Plaintiff Doe's person. Defendant's actions amount to violations under N.Y. Penal Law §§ 130.52, 130.55, and 130.65, as well as analogous California law and the common law of New York and California

90.    Defendant violated the sections cited hereto and Plaintiff suffered damage as a result.

91.    Defendant Gross did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable person's sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person such as would offend a reasonable person's sense of personal dignity.

92.    As a direct and proximate result of the acts of Defendant Gross' acts, Plaintiff sustained serious and permanent injuries to her person and other damage in an amount to be shown according to proof and within the jurisdiction of the Court.

93.    That the aforesaid occurrences and resultant injuries to Plaintiff were caused by reason of the intent, carelessness and recklessness of defendant in suddenly and without provocation Defendant Gross did physically assault and batter Plaintiff herein causing Plaintiff to sustain damages; in that Defendant Gross did conduct herself in a wanton, willful, reckless and heedless manner without regard to the safety of the Plaintiff herein; in that said Defendant was physically abusive; in behaving in a disorderly manner; in using unnecessary, excessive and unlawful touching against the plaintiff; in willfully and maliciously assaulting and battering the Plaintiff herein.

94.    This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Mr. Doe when he was over eighteen years of age. The action

also falls within California's Adult Sexual Abuse Law and is brought during the three-year time period set forth in that action.

## COUNT TWO
### A Cause of Action for Assault and Battery Under New York Law

95.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

96.    A "battery" is an intentional wrongful physical contact with another person without that person's consent. *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 108 (2d Cir.1993); *Villanueva v. Comparetto,* 180 A.D.2d 627, 629, 580 N.Y.S.2d 30, 33 (2d Dep't 1992); *Williams v. Port Auth. of N.Y. and N.J.,* 880 F. Supp. 980, 994 (E.D.N.Y.1995); *see also* 6 N.Y.Jur.2d: Assault Civil Aspects § 1 at 194 (1980).

97.    An "assault" is the intentional placing of another person in apprehension of imminent harmful or offensive contact. *United Nat'l Ins.,* 994 F.2d at 108; *Mortise v. United States,* 910 F. Supp. 74, 76 (N.D.N.Y.1995); *Williams,* 880 F. Supp. at 994; *Emanuel v. Barry,* No. CV-83-810, 1990 WL 172681, at *2 (E.D.N.Y. Oct. 25, 1990); *see* 6 N.Y.Jur.2d: Assault Civil Aspects § 1, at 194 (1980); Restatement (Second) of Torts § 21.

98.    An assault and/or battery occurs when a person is placed in imminent apprehension of harmful or offensive bodily contact and there is an actual use of force. *See* 6 N.Y.Jur.2d: Assault Civil Aspects § 1 at 194.

99.    That Defendant Gross sexually assaulted and battered Plaintiff Doe as set forth above.

100.    Defendant Gross engaged in illegal and improper touching of Plaintiff Doe, against his will and without his consent.

101.    As a result of Defendant Gross' conduct, Plaintiff was placed in apprehension and fear for his physical well-being.

102.  Because of Defendant Gross' position of financial, physical and emotional authority over Plaintiff, and his known mental and emotional state at the time, Plaintiff was unable to, and did not, give legal consent to such acts.

103.  In performing the conduct describe at length above, the Defendant Gross committed a sexual battery and assault against Plaintiff because she intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff Doe's person. Defendant's actions amount to violations under N.Y. Penal Law §§ 130.52, 130.55, and 130.65, as well as analogous California law and the common law of New York and California

104.  As a result of Defendant Gross's repeated unlawful sexual assaults and batteries, Plaintiff Doe suffered serious and permanent injuries as set forth above.

105.  Defendant Gross did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable person's sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person such as would offend a reasonable person's sense of personal dignity.

106.  As a direct and proximate result of the acts of Defendant Gross' acts, Plaintiff sustained serious and permanent injuries to her person and other damage in an amount to be shown according to proof and within the jurisdiction of the Court.

107.  That the aforesaid occurrences and resultant injuries to Plaintiff were caused by reason of the intent, carelessness and recklessness of defendant in suddenly and without provocation Defendant Gross did physically assault and batter Plaintiff herein causing Plaintiff to sustain damages; in that Defendant Gross did conduct herself in a wanton, willful, reckless and heedless manner without regard to the safety of the Plaintiff herein; in that said Defendant was physically

abusive; in behaving in a disorderly manner; in using unnecessary, excessive and unlawful touching against the plaintiff; in willfully and maliciously assaulting and battering the Plaintiff herein.

108. This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Mr. Doe when he was over eighteen years of age. The action also falls within California's Adult Sexual Abuse Law and is brought during the three-year time period set forth in that action.

## COUNT THREE
## A Cause of Action for Assault and Battery Under California Law

109. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

110. That Defendant Gross sexually assaulted and battered Plaintiff Doe as set forth above.

111. Defendant Gross engaged in illegal and improper touching of Plaintiff Doe, against his will and without his consent.

112. As a result of Defendant Gross' conduct, Plaintiff was placed in apprehension and fear for his physical well-being.

113. Because of Defendant Gross' position of financial, physical and emotional authority over Plaintiff, and his known mental and emotional state at the time, Plaintiff was unable to, and did not, give legal consent to such acts.

114. Defendant Gross did subjected Plaintiff to sexual abuse, sexual battery, rape, and forcible act of sexual penetration, as defined in Cal. Penal Code §§ 234.4, 261, and 289. In doing so, he intended

to and did cause harmful and sexually offensive contact with their person and place them in imminent apprehension of such contact.

115.  As a result of Defendant Gross's repeated unlawful sexual assaults and batteries, Plaintiff Doe suffered serious and permanent injuries as set forth above.

116.  Defendant Gross did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable person's sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person such as would offend a reasonable person's sense of personal dignity.

117.  As a direct and proximate result of the acts of Defendant Gross' acts, Plaintiff sustained serious and permanent injuries to her person and other damage in an amount to be shown according to proof and within the jurisdiction of the Court.

118.  That the aforesaid occurrences and resultant injuries to Plaintiff were caused by reason of the intent, carelessness and recklessness of defendant in suddenly and without provocation Defendant Gross did physically assault and batter Plaintiff herein causing Plaintiff to sustain damages; in that Defendant Gross did conduct herself in a wanton, willful, reckless and heedless manner without regard to the safety of the Plaintiff herein; in that said Defendant was physically abusive; in behaving in a disorderly manner; in using unnecessary, excessive and unlawful touching against the plaintiff; in willfully and maliciously assaulting and battering the Plaintiff herein.

119.  This action is timely because it falls within Cal. Civil Code §340.16 and is brought during the three-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute a sexual assault as defined by the California Penal Code, and such acts and/or omissions were committed against Mr. Doe when he was over eighteen years of age.

**COUNT FOUR**

**A Cause of Action for Violations of the Victims of Gender-Motivated Violence Act**

120.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

121.  The above-described conduct of Defendant Gross, including, but not limited to, Ms. Gross' repeated physical and sexual assaults of Plaintiff in New York City, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by the New York City VGMVPL.

122.  The above-described conduct of Defendant Gross, including, but not limited to, Ms. Gross' repeated physical and sexual assaults of Plaintiff in New York City, constitutes a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

123.  Defendant Gross knowingly and purposefully targeted Plaintiff because of his gender, as demonstrated by the bizarre tactics of sexual abuse designed to extract Plaintiff's semen for reproductive purposes.

124.  Defendant's conduct constitutes crimes of "violence motivated by gender" under The Victims of Gender-Motivated Violence Protection Act ("VGMVPA").

125.  Plaintiff suffered numerous physical and emotional injuries as a result of Defendant.

126.  The above are just some of the instances of sexual and physical assault suffered by Plaintiff at the hand of Defendant.

127.  The Defendant intentionally and violently sexually assaulted the Plaintiff, and in the process, humiliated, degraded, and violated him, thereby robbing him of his dignity, and causing him severe emotional distress and lifelong damage.

128.  As a result of defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

129.  As Defendant's conduct has been malicious, unjustifiable, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against Defendant.

130.  Defendant violated the sections cited hereto and Plaintiff suffered damage as a result.

131.  This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Mr. Doe when he was over eighteen years of age. The action also falls within California's Adult Sexual Abuse Law and is brought during the three-year time period set forth in that action.

## INJURY AND DAMAGES

132.  As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of her career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, physical pain, humiliation, mental anguish, suffering,

inconvenience, injury to reputation, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

### JURY DEMAND

Plaintiff Doe requests a jury trial on all issues to be tried.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Doe demands judgment against Defendant Smith, jointly and severally, in an amount to be determined at the time of trial plus interest, including, but not limited to, all compensatory damages, emotional distress, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: New York, New York
      December 27, 2023

**DEREK SMITH LAW GROUP, PLLC**

Caroline H. Miller, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119
Tel: (212) 587-0760
Caroline@dereksmithlaw.com

*Counsel for Plaintiff*